UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

GOODWOOD BREWING, LLC     Plaintiff

v.     Civil Action No. 3:20-CV-306-RGJ

UNITED FIRE GROUP AND UNITED     Defendants
FIRE & CASUALTY COMPANY

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Defendants United Fire Group, Inc. and United Fire & Casualty Company (collectively "United Fire") move for summary judgment [DE 33]. Briefing is complete [DE 34; DE 37; DE 38] and this matter is ripe. For the reasons below, the Court will **GRANT** Defendants' Motion for Summary Judgment [DE 33].

### I.     BACKGROUND

Goodwood Brewing, LLC ("Goodwood"), a brewing company, owns and operates a brewpub in Frankfort, Kentucky, a taproom in Louisville, Kentucky, and a taproom in Jeffersonville, Indiana.[1] [DE 1 at 1]. On March 6, 2020, Governor Andy Beshear issued an executive order declaring a state of emergency in Kentucky based on the outbreak of the COVID-19 virus. *Id.* at 6. On March 16 and March 19, 2020, the Kentucky Cabinet for Health and Family Services, Department of Public Health, and the Public Protection Cabinet, Alcoholic Beverage Control ("Department of Public Heath") issued additional orders (collectively, the "COVID Orders") restricting "food and beverage sales" to "carry-out, delivery and drive-thru only; no onsite consumption is permitted." *Id.*

---

[1] Goodwood's Indiana location is not at issue in this lawsuit. [DE 1 at 2].

1

Goodwood held a Commercial Property Policy ("Policy") from United Fire for the period at issue. *Id.* at 2-3. Goodwood alleges that the COVID Orders have prevented it from physically occupying and using the Kentucky locations. *Id.* at 7-8. Goodwood also alleges that this constitutes "a direct physical loss" as that term is defined in the Policy. *Id.* at 8. And that, as a result of this "direct physical loss," it has "suffered loss of business income, has incurred 'extra expense' to minimize the suspension of business and continue its operations, and has suffered other losses and damages." *Id.*

Goodwood filed an insurance claim with United Fire. After United Fire denied its claim [DE 1-8 at 77-79], Goodwood filed suit in this Court requesting declaratory judgment against United Fire.[2] [DE 1].

## II. DISCUSSION

### A. Jurisdiction

Goodwood brings this action under the Declaratory Judgment Act. [DE 1 at 10-11; 28 U.S.C. § 2201(a)]. While the Act authorizes district courts to exercise jurisdiction, it does not mandate or impose a duty to do so. *Bituminous Cas. Corp. v. J & L Lumber Co., Inc.*, 373 F.3d 807, 812 (6th Cir. 2004). While neither party has addressed the Court's jurisdiction, the Court will first determine whether the exercise of jurisdiction is appropriate under the circumstances of this case before addressing United Fire's summary judgment motion. *See Berkley Assurance Co. v. Carter Douglas Co., LLC*, No. 1:18-CV-00099-GNS, 2020 WL 201051, at *1 (W.D. Ky. Jan. 13, 2020) ("Although the issue has not been raised, courts are encouraged to, sua sponte, examine the

---

[2] In its complaint, Goodwood filed additional claims against United Fire. [DE 1 at 11-16]. The parties have agreed that if "the Court enters declaratory judgment against Goodwood" the "declaratory judgment will dispose of the remaining counts of Goodwood's Complaint." [DE 20 at 151].

issue of whether to exercise their discretion in asserting jurisdiction over actions brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a)").

The court considers five factors ("*Grand Trunk* factors") to determine whether the exercise of Declaratory Judgment Act jurisdiction is proper. *Grand Trunk W.R.R. Co. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir. 1984) (internal quotation marks omitted). Although the Court must balance the five factors, the Sixth Circuit has never clarified the relative weights of the factors. *Id.* at 326.

The first two *Grand Trunk* factors assess "(1) whether the declaratory action would settle the controversy" and "(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue." *Grand Trunk*, 746 F.2d at 326. Because "it is almost always the case that if a declaratory judgment will settle the controversy, . . . it will clarify the legal relations in issue," the inquiries required by these two factors often overlap substantially. *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 397 (6th Cir. 2019) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 557 (6th Cir. 2008); *Bituminous*, 373 F.3d at 814; and *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003)).

There are two lines of cases in the Sixth Circuit. *United Specialty Ins. Co. v. Cole's Place, Inc.*, No. 3:17-CV-00326-TBR, 2018 WL 1914731, at *4 (W.D. Ky. Apr. 23, 2018), *aff'd*, 936 F.3d 386 (6th Cir. 2019) (citing *Flowers*, 513 F.3d at 555). "One line of cases approved of declaratory actions because they can 'settle the insurance coverage controversy,' while a second line of cases disapproved of declaratory actions because while they 'might clarify the legal relationship between the insurer and the insured, they do not settle the ultimate controversy.'" *Id*. (quoting *Flowers*, 513 F.3d at 555).

This action falls into the first line of cases. The parties dispute whether the Policy covers damages arising from Goodwood's alleged inability to operate during the COVID-19 pandemic. There are no fact-bound issues of state law awaiting resolution in the state-court litigation. *See Bituminous*, 373 F.3d at 813–14. As a result, this declaratory judgment action will "settle the controversy," as it resolves the dispute between the insurer and insured over coverage. *See, e.g., W. World Ins. Co. v. Hoey*, 773 F.3d 755, 760–61 (6th Cir. 2014). The first two *Grand Trunk* factors therefore support the exercise of jurisdiction.

The third factor considers "whether the use of the declaratory judgment action is motivated by 'procedural fencing' or [is] likely to create a race for res judicata." *Flowers*, 513 F.3d at 558. Based on the parties' pleadings, there is no competing state court declaratory action. Thus, the third *Grand Trunk* factor supports the exercise of jurisdiction.

The fourth *Grand Trunk* factor addresses "whether accepting jurisdiction would increase friction between federal and state courts" and is broken into three sub-factors. *Flowers*, at 559. The first sub-part "focuses on whether the state court's resolution of the factual issues in the case is necessary for the district court's resolution of the declaratory judgment action." *Flowers*, 513 F.3d at 560. Here, any factual determinations the Court may have to make will not overlap with those in a state court action because there is no state court action pending. As a result, this sub-factor supports exercising jurisdiction.

The second sub-part examines "which court, federal or state, is in a better position to resolve the issues in the declaratory action." *Id*. The Sixth Circuit has "found that 'issues of insurance contract interpretation are questions of state law with which the Kentucky state courts are more familiar and, therefore, better able to resolve.'" *Id.* at 561 (quoting *Travelers Indem. Co. v Bowling Green Prof. Assoc.*, 495 F.3d 266, 273 (6th Cir. 2007)). The questions that would arise

here do not, however, involve novel issues of Kentucky law. Although Kentucky appellate courts do not appear to have addressed the exact issues raised, the novel factor of the COVID-19 pandemic does not make this action inappropriate for this Court to consider because it involves application of well-established Kentucky principles of insurance policy interpretation. *See Cole's Place, Inc.*, 2018 WL 1914731 at *8. The second sub-factor therefore is neutral.

The third sub-part "focuses on whether the issue in this federal action implicates important state policies and is, thus, more appropriately considered in state court." *Flowers*, 513 F.3d at 561. Kentucky state courts are "more familiar and, therefore, better able to resolve" interpretation of insurance contracts. *Id*. Even when the state law is not difficult to apply, the Sixth Circuit has usually found "that the interpretation of insurance contracts is closely entwined with state public policy." *Cole's Place, Inc.*, 936 F.3d at 401, citing *e.g.*, *Flowers*, 513 F.3d at 561 and *Travelers*, 495 F.3d at 273. Because this action involves an interpretation of a Kentucky insurance contract, the third sub-factor counsels against exercising jurisdiction.

The fifth and final factor asks "whether there is an alternative remedy which is better or more effective" than federal declaratory relief. *Grand Trunk*, 746 F.2d at 326. Kentucky law provides a declaration of rights procedure under KRS § 418.040. *Mass. Bay Ins. Co. v. Christian Funeral Dirs., Inc.*, No. 18-5267, 2018 WL 6787945, at *8 (6th Cir. Dec. 26, 2018). The Sixth Circuit has held that, "[i]n many ways, this alternative would have been better." *Flowers*, 513 F.3d at 562. Specifically, "[t]he Kentucky courts are in a superior position to resolve undecided questions of state law," and "Kentucky courts might also have been able to combine the two actions so that all issues could be resolved by the same judge." *Id.* For these reasons, overall, the fifth *Grand Trunk* factor weighs against exercising jurisdiction.

As noted above, the Sixth Circuit has never suggested the relative weight of the factors; instead, "[t]he relative weight of the underlying considerations of efficiency, fairness, and federalism will depend on facts of the case." *Cole's Place, Inc.*, 936 F.3d at 402 (citing *Hoey*, 773 F.3d at 759). Further, "[t]he essential question is always whether [the court] has taken a good look at the issue and engaged in a reasoned analysis of whether issuing a declaration would be useful and fair." *Id*. (citing *Hoey,* 773 F.3d at 759) (citation omitted). Having evaluated those factors, the first three factors support exercising jurisdiction, as does one of the sub-factors of the fourth factor. Because of the importance of these factors, the exercise of the Court's discretionary jurisdiction is appropriate.

**B. Summary Judgment**

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion." *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008); *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *Williams v. Int'l*

*Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252.

The parties agree that the Policy is governed by Kentucky law. [DE 34 at 199; DE 37 at 664]. In a declaratory judgment action regarding an insurance policy, the initial burden is on the insured to establish that the incident at issue was within the scope of the policy. *Secura Ins. Company v. Gray Constr., Inc.,* 717 F. Supp. 2d 710, 714–15 (W.D.Ky.2010), modified on clarification (July 12, 2010). If the insured demonstrates that coverage exists, the burden then shifts to the insurer to establish that an exclusion bars coverage. *Id.* at 715.

To determine whether coverage exists, the Court begins by interpreting the relevant insurance contract. *Stone v. Ky. Farm Bureau Mut. Ins. Co.,* 34 S.W.3d 809, 810 (Ky.Ct.App.2000). "The primary object in construing a contract . . . is to effectuate the intentions of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 384 (Ky.Ct.App.2002). The parties' intentions are to be discerned from the four corners of the contract. *Id.* In the absence of any ambiguities, the Court enforces the terms as written. *McMullin v. McMullin,* 338 S.W.3d 315, 320 (Ky.Ct.App.2011) (citing *Whitlow v. Whitlow,* 267 S.W.2d 739, 740 (Ky.1954)).

"A contractual provision is ambiguous if the provision is susceptible to multiple or inconsistent interpretations." *McMullin,* 338 S.W.3d at 320. Contractual terms are assigned their ordinary meaning, *Frear v. P. T.A. Indus., Inc.,* 103 S .W.3d 99, 106 (Ky.2003), and courts are "simply unwilling to torture words to import ambiguity into a contract where the ordinary meaning leaves no room for ambiguity." *First Home, LLC v. Crown Communications, Inc.,* No.2010–CA–001701–MR, 2012 WL 95560 at *5 (Ky.Ct.App. Mar. 15, 2012). That said, the contract should be liberally construed and all ambiguous terms resolved in favor of the insured. *Ky. Farm Bureau Mut. Ins. Co. v. McKinney,* 831 S.W.2d 164, 166 (Ky.1992).

Goodwood asserts coverage under three of the Policy's coverage provisions: Business Income or Extra Expenses Coverage; Dependent Property Coverage; and Civil Authority Coverage. United Fire contends that none of these provisions provides coverage for Goodwood's alleged losses. [DE 1 at 7-10].

**1. Business Income and Extra Expense Coverage**

The Building and Personal Property Coverage Form provides:

> A. Coverage
>
> We will pay for direct physical loss of or damage to Covered Property premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

[DE 1-2 at 23].

The Policy defines Covered Cause of Loss as "direct physical loss unless the loss is excluded or limited in this policy." *Id.* at 39.

The Micro-Brewery Ultra Property Plus form, under which Goodwood also seeks coverage, modifies the Building and Personal Property Coverage Form as follows:

> H. At Section A. Coverage 4. Additional Coverages the following provisions for optional additional coverages are added:

> Optional Business Income and Extra Expense Coverage
> a. Business Income
> . . .
> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. . . .
>
> . . .
> c. Extra Expense Coverage
> Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

[DE 1-4 at 49].

The Policy does not define the phrase "direct physical loss of or damage to." United Fire argues that it means "a tangible loss of or harm to the insured property, in whole or part." [DE 34 at 206]. Applying this definition to the undisputed facts in the case, United Fire asserts that the Policy does not cover Goodwood's alleged losses:

> At the outset, Goodwood has only alleged economic losses, specifically a loss of use. Goodwood cannot prove that the COVID-19 virus is or has been present at the Kentucky properties, let alone that COVID-19 has caused any tangible, physical alteration or damage to the Kentucky properties . . . Here, there is simply no evidence that any physical alteration or damage occurred to the Kentucky properties. At most, Goodwood has generally alleged that one of its employees was diagnosed with COVID-19. This does not prove the virus was present at the Kentucky properties and even if it did, it does not prove the Kentucky properties were physically altered or damaged. Surfaces can be cleaned.

*Id.* at 206-07.

Goodwood, on the other hand, argues that the phrase means "a deprivation of property" and that it was "deprived of its property, and of its full use and occupation of its property, by COVID-19 and Kentucky's related Executive Order 2020-215, thus entitling [it] to coverage under the Policy." [DE 37 at 662]. Put differently, Goodwood asserts that it "lost the ability to physically

9

occupy its own property and thus suffered a physical loss, rather than having the property foreclosed upon and thus suffering a legal loss or becoming unpopular and suffering a profit loss." *Id.* at 663.

Kentucky appellate courts have not extensively examined the meaning of "direct physical loss or damage to" in the context of an insurance policy. Nor has the Sixth Circuit when applying Kentucky law. *Cf. Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 575 (6th Cir. 2012) (applying Michigan law) ("[W]hile Universal certainly suffered a large inconvenience as a result of the mold and bacterial contamination of the Evergreen building, the damages resulting therefrom are not covered by the insurance policy issued by Federal. Universal did not suffer any tangible damage to physical property, nor were the Evergreen premises rendered uninhabitable or substantially unusable").

The parties cited ample non-binding precedent. [DE 34 at 208-13; DE 37 at 665-71]. Based on the Court's review of this precedent, courts across the country have diverged in how they interpret "direct physical loss of or damage to" in insurance contracts. The majority of courts, however, agree with United Fire.[3] *See Bluegrass Oral Health Ctr., PLLC v. Cincinnati Ins. Co.*, No. 1:20-CV-00120-GNS, 2021 WL 1069038, at *4 (W.D. Ky. Mar. 18, 2021) (collecting cases). While the majority position does not determine the outcome here, it is compelling to the Court that most courts side with United Fire. Most relevant to the Court's analysis, though, is precedent filtering the meaning of "direct physical loss of or damage to" through the lens of Kentucky law.

---

[3] The minority of courts agree with Goodwood's interpretation. Goodwood cites many of these cases in its response, but pays particular attention to *In re: Society Ins. Co., COVID-19 Bus. Interruption Protection Ins. Litig.*, 2021 WL 679109 (N.D. Ill. Feb. 22, 2021), *Elegant Massage v. State Farm*, 2020 WL 7249624, at *9 (E.D. Va. Dec. 9, 2020), *Hill & Stout v. Mutual of Enumclaw Ins.*, 20-2-7925-1 (Sup. Ct. Wash. Nov. 13, 2020), and *N. State Deli v. Cincinnati Ins.*, 20-CVS-2569 (Durham County Sup. Ct., N.C. Oct. 9, 2020). [DE 37 at 663-71]. The Court declines to follow them, however, because they have been rejected by numerous courts, do not interpret Kentucky law, and are from outside the Sixth Circuit.

Particularly relevant here are recent cases from the Eastern District of Kentucky (*Ashland Hosp. Corp. v. Affiliated FM Ins. Co.*, No. CIV.A. 11-16-DLB-EBA, 2013 WL 4400516, at *1 (E.D. Ky. Aug. 14, 2013) and *LexFit, LLC v. W. Bend Mut. Ins. Co.*, No. CV 5:20-413-DCR, 2021 WL 2382519, at *1 (E.D. Ky. June 10, 2021)) and the Western District of Kentucky (*Bluegrass*).

In *Ashland*, the plaintiff, a hospital, stored all its electronic records on a third-party vendor's data network. *Ashland*, 2013 WL 4400516, at *1. Unfortunately, the data network overheated and the hospital's electronic records were physically corrupted and had to be restored. *Id.* at 2. After the plaintiff's insurance carrier denied coverage under the "direct physical loss of or damage to" provision of the insurance policy, plaintiff filed a declaratory judgment action. *Id.* The court framed "the central question" as "whether the phrase 'direct physical loss or damage' includes a loss of reliability suffered by a data storage network due to heat exposure." *Id.* at 4. The court found that "loss of reliability" was covered under the policy's "direct physical loss or damage" provision:

> The phrase "direct physical loss or damage," as applied to Plaintiff's data storage network, encompasses a loss of reliability caused by excessive temperature. There are two reasons the Court makes this finding. First, the component damage at issue here is undeniably "direct" and "physical": it is "direct" because the harm flows immediately or proximately from the heat exposure, and it is "physical" because the harm results from physical alteration to the components themselves.
>
> It is undisputed, for instance, that disk drive damage occurs on a microscopic level through a process called "ionic migration," in which "lubricants are thinned or ... move around because they're more fluid [as a result of heat exposure]." It is also undisputed that heat exposure can degrade the disk drives "Annualized Failure Rate," meaning their annual risk of failure—or in other words, their reliability. There is no question, therefore, that degradation of a disk drive's Annualized Failure Rate due to heat exposure is a *physical* process.

*Id.* at 5 (internal citation omitted).

Bluegrass Oral Health Center ("BOHC"), a dental clinic, closed in response to an order from the Kentucky Department of Public Health directing that "all non-emergent medical, surgical,

11

dental, or other health care practices or procedures cease effective the close of business on March 18, 2020." *Bluegrass*, 2021 WL 1069038 at *1. BOHC sued its insurance company after it refused to provide coverage under the policy's civil authority provision. *Id.* The parties disputed the meaning of phrase "direct physical loss" in the policy. *Id.* at 2. After reviewing relevant precedent and examining the dictionary definitions of "direct," "physical," and "loss," the court determined:

> The primary dictionary definition of loss is "destruction" or "ruin." *Loss*, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss (last visited Mar. 17, 2021). Thus, in context, "physical loss" would mean destruction or ruin produced by the forces or operation of physics. *Physical*, Merriam-Webster, https://www.merriamwebster.com/dictionary/physical (last visited Mar. 17, 2021). In this light, "physical loss" would apply to property destroyed by some force, contrasted with "physical damage" which would cover a lesser extent of harm short of destruction or ruin. Thus, the policy would extend to the continuum of harm from total (loss) to partial (damage) resulting in alteration to an insured property. *See Robert E. Levy D.M.D., LLC*, 2021 WL 598817, at *11. This is a far more reasonable construction than interpreting "direct physical loss" to mean "direct physical loss of use," which frankly makes no sense.

*Id.* at 4.

Based on this definition of "direct physical loss," the court found that there was no coverage under the policy. *Id.* at 5.

Finally, the court in *LexFit* considered whether the "direct physical loss" provision of the plaintiff's insurance policy covered economic losses it suffered when it was forced to close due to COVID-19. *LexFit, LLC v. W. Bend Mut. Ins. Co.*, No. CV 5:20-413-DCR, 2021 WL 2382519, at *1 (E.D. Ky. June 10, 2021). Citing and agreeing with *Bluegrass,* the court found that "direct physical loss" requires "tangible harm or damage to the property covered by the agreement. Accordingly, a purely economic loss cannot qualify as a 'direct physical loss.'" *Id.* at 4.

*Ashland*, *Bluegrass*, and *LexFit* are persuasive and apply here. The Court finds as a matter of law that "direct physical loss or damage to" requires "tangible harm or damage to the property covered by the agreement." *Id.* Applying that interpretation to the undisputed facts in this case,

12

the Court finds that Goodwood's economic losses and alleged inability to access its properties due to the COVID Orders do not constitute "tangible harm and damage to the property." As a result, Goodwood is not entitled to business income and extra expense coverage for its claims.

## 2. **Dependent Property Coverage**

The Micro-Brewery Ultra Property Plus form provides:

> h. Coverage Extensions for Business Income and Extra Expense
> . . .
> (3) Business Income and Extra Expense for Dependent Properties
> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration" caused by direct physical loss of or damage to "dependent property" by a Covered Cause of Loss.

[DE 1-4 at 52].

The Policy defines "dependent property" as:

> property operated by others whom you depend on to:
> a. Deliver materials or services to you, or to others for your account (contributing locations). But any property which delivers any of the following services is not a Contributing Location with respect to such services:
>     (i) Water supply services;
>     (ii) Power supply services; or
>     (iii) Communication supply services, including services relating to internet access to any electronic network;
> b. Accept your products or services (Recipient Locations);
> c. Manufacture products for delivery to your customers under contract of sale (Manufacturing Locations); or
> d. Attract customers to your business (Leader Locations}.

*Id.* at 66.

United Fire asserts that dependent party coverage does not apply because, while Goodwood "generally alleged in its Complaint that it relies upon dependent businesses who have been shut down by Executive Orders and that Goodwood is entitled to coverage," it failed to "specifically identify the dependent properties or describe the 'physical loss' suffered" and "United Fire has

13

already demonstrated herein that loss of use resulting from COVID-19 closure orders does not amount to 'direct physical loss of or damage' to property." [DE 34 at 215].

Goodwood counters that it:

> has pled a sufficient claim for dependent property coverage. Because customers and other businesses were restricted during the shutdown, Plaintiff relies upon dependent businesses, including numerous bars and restaurants in Kentucky who buy and distribute Plaintiff's beer, who were similarly affected by COVID-19 and the executive orders limiting access to their properties. This claim is sufficient to state a claim for dependent property coverage.

[DE 37 at 674-75].

The Court has found as a matter of law that "direct physical loss of or damage to" requires "tangible harm or damage to the property covered by the agreement." *LexFit*, 2021 WL 2382519 at *4. United Fire has demonstrated that there are no issues of genuine material fact about whether the alleged dependent properties suffered "tangible harm or damage" to their property, and Goodwood has failed to produce facts showing that they have. *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 247–48. As a result, Goodwood is not entitled to dependent property coverage for its claims.

### 3. Civil Authority Coverage

The Civil Authority provision provides:

> g. Additional Coverages for Business Income and Extra Expense
> . . .
> (1) Civil Authority
> . . .
> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
> a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

14

> b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have uninterrupted access to the damaged property.

[DE 1-4 at 50].

United Fire contends that "Goodwood cannot show a 'Covered Cause of Loss' because there is no evidence of any direct physical loss to property in the area immediately surrounding Goodwood's Kentucky properties." [DE 34 at 215-16]. But, even if Goodwood could demonstrate a Covered Cause of Loss, United Fire argues that Goodwood's claim for civil authority coverage would still fail because "there is no evidence that Goodwood was prohibited access to its premises." *Id.* at 216.

> Goodwood argues:
>
> The policy does not define access, and Defendant broadly reads the policy to only apply where no access whatsoever is permitted. Contrary to Defendant's interpretation, this Court must interpret the policy in Plaintiff's favor under Kentucky law. In addition, Kentucky law requires that the policy provide any coverage that a policyholder would reasonably expect. In this case, the policy covers a prohibition on customer access to the premises for purposes of onsite service of food and beverages.

[DE 37 at 673].

The Court disagrees. The Civil Authority provision is conjunctive: there is no coverage under it unless both (a) and (b) are satisfied. United Fire has demonstrated that there are no genuine issues of material fact about both (a) and (b), and Goodwood has failed to produced facts showing there are. Indeed, Goodwood has completely failed to address (b). As a result, Goodwood is not entitled to civil authority coverage for its claims. *See Bluegrass*, 2021 WL 1069038 at *5 ("'Civil Authority' coverage sought by BOHC requires a claim for a tangible loss to property other than the insured property, which BOHC has failed to identify. Further, the Civil Authority coverage

15

does not apply because there is no allegation that BOHC lost access to its business due to damage to surrounding property").

**4. Reasonable Expectation Doctrine**

Finally, Goodwood argues that "[b]ecause the policy explicitly covers loss in the absence of damage, a reasonable policyholder would expect coverage." [DE 37 at 665]. United Fire asserts: "[T]he reasonable expectations of the insured are not properly considered where the terms of the policy are plain and unambiguous . . . Since the beginning of the COVID-19 pandemic, the majority of courts considering COVID-19 business interruption claims have similarly found the phrase 'direct physical loss or damage' is unambiguous and requires tangible, physical alteration or damage to covered property." [DE 34 at 214].

"The rule of interpretation known as the 'reasonable expectations doctrine' resolves an insurance policy ambiguity in favor of the insured's reasonable expectations." *Kentucky Employers' Mut. Ins. v. Ellington*, 459 S.W.3d 876, 883 (Ky. 2015) (quoting *Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 837 (Ky. 2005). The basic thrust of this doctrine is "that the insured is entitled to all the coverage he may reasonably expect to be provided under the policy." *Id.* (quoting *Simon v. Continental Ins. Co.*, 724 S.W.2d 210, 212 (Ky. 1986)). "Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation." *Id.* (quoting *Simon*, 724 S.W.2d at 212). "This test looks to the reasonableness of what an insured may believe about coverage, and necessarily relies heavily on the facts." *Id.* But reasonable expectations are "not ascertained from the subjective belief, however genuine, of the insurance applicant"; rather, the "test in determining reasonable expectations is based on construing the policy language as a layman would understand it." *Sparks v. Trustguard Ins. Co.*, 389 S.W.3d 121, 128 (Ky. App. 2012). "Only actual ambiguities in the

policy language will trigger the doctrine of reasonable expectations." *Id.* (citing *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003)).

First, as discussed in this Opinion, the contested provisions in the Policy do not "explicitly cover[] loss in the absence of damage." Rather, they cover "tangible harm or damage." *LexFit*, 2021 WL 2382519 at *4. As a result, a reasonable policyholder would not expect coverage for loss of the ability to use the covered property. Second, this Court joins others in finding that "direct physical loss" is unambiguous. *See, e.g.*, *Ashland*, 2013 WL 4400516 at *8; *LexFit*, 2021 WL 2382519 at *3. Third and finally, based on how "direct physical loss" is used throughout the Policy, it would be unreasonable for Goodwood to expect that its alleged inability to physically use or access its properties would be covered. As illustrated in the examples below, "direct physical loss" is used in the Policy in conjunction with "tangible harm or damage" to the covered property, not the "physical loss" of the ability to use it:

> 5. Tenant's Building Glass Coverage
> If you are a tenant and no Limit of Insurance is shown in the Declarations for Building Coverage you may extend the insurance provided for Your Business Personal Property to cover direct physical loss or damage to building glass that is part of the exterior or interior walls, floors or ceilings of the building or structure occupied by you at the premises shown in the Declarations.
> We will also pay for necessary:
> > a. Expenses incurred to put up temporary plates or board up openings;
> > b. Repair or replacement of encasing frames; and
> > c. Expenses incurred to remove or replace obstructions.
>
> . . .
>
> s. "Micro-Brewery" Leakage or Spillage
> We will pay up to $25,000 for direct physical loss or damage due to sudden and accidental leakage or spillage of microbrew. Coverage does not apply if you left valves open which caused the leakage or spillage of microbrew.
>
> . . .
>
> u. Tank Collapse

17

> We will pay for direct physical loss or damage to microbrew storage tanks from collapse of a tank resulting from external tank air pressure being greater than internal tank air pressure.

[DE 1-4 at 56-64].

The context in which "direct physical loss" is used throughout the Policy constitutes an "unequivocally conspicuous, plain and clear manifestation of [United Fire's] intent to exclude coverage." *Ellington*, 459 S.W.3d at 883.

### III. CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **HEREBY ORDERS AS FOLLOWS**:

(1) The Court finds that the exercise of its jurisdiction over this declaratory judgment action under 28 U.S.C § 2201 is proper.

(2) United Fire's Motion for Summary Judgment, [DE 33], is **GRANTED**.

(3) This matter is **DISMISSED** with prejudice and **STRICKEN** from the Court's active docket.

(4) The Court will enter a separate Judgment.